# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| **MATTHEW WARMAN,** | : | **Appeal No. 24-3042** |
| | : | |
| **Plaintiff - Appellant,** | : | **District Court No. 1:22-CV-00229** |
| | : | |
| **v.** | : | |
| | : | **On Appeal from Southern District** |
| **MOUNT ST. JOSEPH UNIVERSITY,** | : | **of Ohio, Western Division** |
| *et al.* | : | |
| | : | |
| **Defendants - Appellees.** | : | |

---

## BRIEF OF PLAINTIFF-APPELLANT MATTHEW WARMAN

---

| | |
|---|---|
| ATTORNEYS FOR<br>PLAINTIFF-APPELLANT | Ronald A. Berutti (NJ 023361992/*PHV)*<br>MURRAY-NOLAN BERUTTI LLP<br>100 E. Hanover Avenue, St. 401<br>Cedar Knolls, New Jersey 07927<br>ron@murray-nolanberutti.com<br>*Attorney for the Plaintiff-Appellant* |
| | Matthew S. Okiishi (00096706)<br>FINNEY LAW FIRM, LLC<br>4270 Ivy Pointe Blvd., Ste 225<br>Cincinnati, Ohio 45245<br>(513) 943-6659<br>(513) 943-6669 – fax<br>matt@finneylawfirm.com<br>*Local Counsel for the Plaintiff-Appellant* |
| ATTORNEYS FOR<br>DEFENDANTS-APPELLEES | Ilana L. Linder (0095622)<br>Timothy M. Burke (0009189)<br>Micah E. Kamrass (0092756) |

MANLEY BURKE, LPA
225 W Court Street
Cincinnati, Ohio 45202
Phone: (513) 721-5525
Fax: (513) 721-4268
ilana.linder@manleyburke.com
tburke@manleyburke.com
 mkamrass@manleyburke.com
*Attorneys for the Defendants-Appellees*

# TABLE OF CONTENTS

STATEMENT IN SUPPORT OF ORAL ARGUMENT ............................................................. 1

STATEMENT OF JURISDICTION ................................................................................. 1

STATEMENT OF THE ISSUES ................................................................................... 2

STATEMENT OF THE CASE ..................................................................................... 2

STATEMENT OF MATERIAL FACTS ............................................................................ 2

    A.   Mr. Warman enrolls in Mount St. Joseph University's graduate nursing program and ultimately has his medical and religious exemption requests denied after being subjected to an unlawful arrest and harassment. ............................................................. 2

    B.   As a result of Defendants' actions, Mr. Warman is prevented from completing his studies and is forced to withdraw from MSJU. ........................................................ 11

SUMMARY OF THE ARGUMENT ............................................................................... 11

    ARGUMENT ............................................................................................... 13

    Standard of Review ....................................................................................... 13

    Argument .................................................................................................. 15

    I.   Issue One: The District Court erred dismissing Mr. Warman's Second Amended Complaint under Rule 12(B)(6). ............................................................................. 15

        A.   MSJPD is a Public Entity that is Subject to Suit, and its Police Officers Koopman and Koo are State Actors, and were Directed by Private Actors who Engaged in State Action. ................................................................................................... 15

        B.   The SAC Plausibly Alleges that Koopman and Koo Violated Mr. Warman's Fourth and Fourteenth Amendment Rights. ............................................................... 19

        C.   Mr. Warman has Stated a Plausible Claim under the Rehabilitation Act. ........... 21

        D.   Mr. Warman Stated a Plausible Fourteenth Amendment Equal Protection Claim. 24

    II. Issue Two: The District Court erred in determining that Defendants were entitled to qualified immunity. ...................................................................................... 28

    III. Issue Three: The District Court erred in refusing to grant leave to Mr. Warman to Amend his Complaint and classifying it as a "shotgun pleading." ................................. 31

**CONCLUSION** ........................................................................................... 34

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT** ............................... 35

**CERTIFICATE OF SERVICE** ........................................................................ 36

**APPENDIX** .............................................................................................. 37

**ADDENDUM** ............................................................................................ 38

ii

# TABLE OF AUTHORITIES

**Cases**

*Arnold v. CooperSurgical, Inc.*, 681 F.Supp.3d. 803, 823-24 (S.D. Ohio 2023) ....32

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ...........................................................14

*Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020) .............................................29

citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................14

*City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) ................................................28

*Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995) .13

*Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988) ........................................29

*District of Columbia* v. *Wesby*, 583 U. S. 48, 62 (2018) ........................................28

*Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) .........................................29

*Hale v. Vance*, 267 F.Supp.2d 725 (S.D. Ohio 2003) .............................................16

*Health Freedom Def. Fund, Inc. v. Carvalho*, __ F.4th __, 2024 U.S. App. LEXIS 13910, *22 (9th 2024) ........................................................................................24

*Hishon v. King & Spalding*, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984)......................................................................................................................14

*Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422 (2021) (Thomas, J., concurring) .........30

*Keweenaw Bay Indian Community v. Michigan*, 11 F.3d 1341, 1348 (6th Cir. 1993) ...............................................................................................................................33

*Lawson v. City of Youngstown*, 912 F. Supp.2d 527 (N.D. Ohio 2012) ..................16

*Lee v. Ohio Educ. Ass'n*, 951 F.3d 386, 393 (6th Cir. 2020) ..................................32

*Lindke v. Freed*, 37 F.4th 1199,1202 (6th Cir. 2022) .............................................17

*Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002) ...........................................22

*Malley* v. *Briggs*, 475 U. S. 335, 341 (1986)................................................................28

*Manuel v. City of Joliet*, 580 U.S. 357, 368 (2017)......................................................29

*McCleskey v. Kemp,* 481 U.S. 279, 292 (1987)..............................................................26

*Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)............................................................29

*Morrison v. Bd. of Trs.,* 583 F.3d 394, 400 (6th Cir. 2009) ...........................................29

*O'Brien v. City of Grand Rapids*, 23 F.3d 990, 998 (6th Cir. 1994).............................14

*Painter v. Robertson*, 185 F.3d 557, 569 (6th Cir. 1999)..............................................29

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009)............................................................28

*Pyke v. Cuomo*, 258 F.3d 107, 108-109 (2d Cir. 2001) ........................................... 25, 28

*Sandison v. Mich. High Sch. Athletic Ass'n*, 64 F.3d 1026, 1030-31 (6th Cir. 1995)
..............................................................................................................................21

*Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 263 (6th Cir. 2006). .......28

*Sistrunk v. City of Strongsville*, 99 F.3d 194, 197 (6th Cir. 1996) ...........................13

*Soldal v. Cook County*, 506 U.S. 56, 61 (1992)..............................................................28

*State ex rel. Fair Hous. Opportunities of Nw. Ohio v. Ohio Fair Plan*, 172 Ohio St.
3d 149, 153 (2023)............................................................................................ 17, 18

*State ex rel. Fox*, 39 Ohio St. 3d 108, 110 (1988) .........................................................17

*State ex rel. Schiffbauer v. Banaszak*, 142 Ohio St. 3d 535, 537 (2015).................17

*Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968) .....................................................................19

*United States v. Ave*ry, 137 F.3d 343, 353 (6th Cir. 1997)...........................................26

*United States* v. *Martinez-Fuerte*, 428 U.S. 543, 554 (1976).......................................19

*Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321 (11th Cir. 2015)
..............................................................................................................................32

*Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015)................................................28

*Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992)...........................................18

**Other Authorities**

29 *U.S.C* § 794 ........................................................................................21

*Fed. R. Civ. P.* 10(c)................................................................................33

*ORC* 149.011(A) .....................................................................................17

*ORC* 1713.50(B) .....................................................................................16

*ORC* 1713.50(B-C) ..................................................................................16

*ORC* 1713.50(C) .....................................................................................16

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiff-Appellant requests oral argument. This case presents important and unique questions of law concerning Fourth Amendment arrest issues, statutory application, the adequacy of pleadings for purposes of a "well-pleaded complaint," and state deprivation of rights. Plaintiff-Appellant would appreciate the opportunity to respond to the Court's questions raised by the parties' briefs, and to clarify the finer points of the law discussed therein.

## STATEMENT OF JURISDICTION

1. Statement of District Court Jurisdiction: Plaintiff brought this action in the District Court under 42 U.S.C. §1983, alleging Defendants violated his First, Second, Fourth, and Fourteenth Amendment rights, as well as those arising under 29 U.S.C. §794. Accordingly, the District Court had federal question jurisdiction under 28 U.S.C. §1331.

2. Statement of Appellate Jurisdiction: On January 3, 2024, the District Court issued a Final Judgment, stating as follows: "Plaintiff's federal claims… are dismissed with prejudice." (Judgment in a Civil Action, R. 38). Plaintiff-Appellant filed a notice of appeal on January 18, 2024. (R. 39).

3. Prior or Related Appellate Proceedings: There are no prior or related appellate proceedings.

## STATEMENT OF THE ISSUES

ISSUE ONE: Whether the District Court erred in dismissing Mr. Warman's Second Amended Complaint under Rule 12(B)(6).

ISSUE TWO: Whether the District Court erred in determining that Defendants were entitled to Qualified Immunity.

ISSUE THREE: Whether the District Court erred in denying Mr. Warman leave to Amend his Second Amended Complaint and in classifying it as a "shotgun pleading."

## STATEMENT OF THE CASE

This case comes before the Court on Plaintiff-Appellant Matthew Warman's appeal of the District Court's Order dismissing his federal claims in favor of Defendants. (R. 37, 38).

## STATEMENT OF MATERIAL FACTS
**A. Mr. Warman enrolls in Mount St. Joseph University's graduate nursing program and ultimately has his medical and religious exemption requests denied after being subjected to an unlawful arrest and harassment.**

In March 2014, Mr. Warman enlisted in the United States Marines and was medically discharged due to internal injuries and brain tumors on in September 2018. (R. 18, PAGEID 311,315). In December 2020, Mr. Warman enrolled in Defendant Mount St. Joseph University's ("MSJU") graduate nursing program, with an expected graduation slated for spring 2022. (R. 18, PAGEID 315).

2

At the time of his enrollment, Mr. Warman advised MSJU that he suffered from a medical disability, including post-discharge depression and anxiety after being discharged due to serious medical problems beyond his control. (R. 18, PAGEID 315). Pursuant to the MSJU Catalog, Mr. Warman would maintain his academic standing by (1) Maintaining a cumulative GPA of 3.0/4.0; (2) Earning grades of B or better in all Category I clinical courses; and (3) Earning grades of C or better in all Category II didactic courses. (R. 18, PAGEID 316). At all times, Mr. Warman maintained an exemplary 4.0 GPA. (R. 18, PAGEID 316).

**B.      Mr. Warman, a devout Catholic with religious objections to (and medical concerns about) the vaccine, applies for an exemption. The exemption is denied, and a concerted campaign of intimidation begins.**

In August 2021, MSJU initiated a COVID-19 vaccination policy (the "**Policy**"). (R. 18, PAGEID 317). At the beginning of the Fall 2021 semester, MSJU informed incoming students that it would require COVID-19 vaccination. However, Mr. Warman is a devout Catholic who maintains the sincerely held belief that the knowing use of the stem cells from aborted fetal tissue is a sin. (R. 18, PAGEID 319-20). At the time MSJU's vaccine policy was in place, each of the EUA COVID-19 vaccines relied on fetal cell lines in their research and development. (R. 18, PAGEID 319). As a result, Mr. Warman could not take any of the EUA vaccines available for use. As such, and consistent with his sincerely held belief, on September 9, 2021, Mr. Warman submitted a detailed explanation as the nature of his belief, its sincerity,

and why he could not take the COVID-19 vaccine. (R. 18, PAGEID 320). That same day, Mr. Warman submitted a medical exemption letter from his doctor, Daved E. Schleuter, M.D., which advised MSJU the COVID-19 vaccines were inappropriate for Mr. Warman in light of his pre-existing and ongoing medical conditions stating, in no uncertain terms, that "Mr. Warman has a medical need to avoid taking the COVID vaccines." (R. 18, PAGEID 320).[1]

On September 15, 2021, Defendant Koo, the MSJPD Chief of Police of the MSJ Police Department ("MSJPD"), called Mr. Warman to campus to speak with him about his decision to refuse the vaccine. The matter was apparently urgent, as Koo or his subordinate Captain Koopman, called or had Mr. Warman called six times, and emailed. (R. 18, PAGEID 321). At approximately 1:00 p.m. that same

---

[1] In addition to his physician's diagnosis, the available data shows that as of March 14, 2022, which approximates the date that the Policy was terminated, there were 13,273 preliminary reports of vaccine-caused deaths made to the Centers for Disease Control's Vaccine Adverse Effects Reporting System ("VAERS"). As of February 8, 2023, such number had risen to **19,224**. For comparison purposes, in the 20 years of the combined Afghanistan and Iraq Wars, a total of **7,054** American service men and women died. Similarly, thousands of cases of myocarditis and pericarditis-- potentially life threatening heart conditions--were reported to VAERS, as were dangerous and debilitating conditions such as anaphylaxis, thrombosis with Thrombocytopenia Syndrome, and Guillaine-Barre Syndrome, among other adverse health effects, some of which have been particularly common in young men under 30 years old, such as Mr. Warman. The CDC's Reported Adverse Events, which contains the subject VAERS data which is periodically updated, is incorporated herein by reference, and is made a part hereof, and based on historical standards contains gross underreporting believed to be by as much as a 100X factor. Meanwhile, men of Mr. Warman's age have a chance of dying from COVID which statistically, is much below 1%, and closer to zero. (R. 18, PAGEID 318-19).

day, Mr. Warman reported to MSJPD and Defendants Koo and Koopman took him into a back room of the campus police station and would not allow him to leave, thus arresting him in fact. (R. 18, PAGEID 321; R. 29-1, PAGEID 609-10). Defendants Koopman and Koo proceeded to use their time to berate Mr. Warman, belittle his religious practices, and utilized other badgering tactics. They called him a "f*****g idiot," told him to get a new religion, that his beliefs were wrong; they told Mr. Warman that he "should grow the f*** up and get the damn shot", they falsely asserted, "you are just doing this because you are failing," and that they would take Mr. Warman to the student center to get vaccinated. (R. 18, PAGEID 321-22). Finally, when they learned that Defendant Karen Elliott was unable to come to the police station, they allowed Mr. Warman to leave, after detaining and berating him for over an hour. (R. 18, PAGEID 322; R. 29-1, PAGEID 609).

His experience with Koo and Koopman exacerbated Mr. Warman's psychological conditions, which included that he was already suffering from clinical anxiety and depression. (R. 18, PAGEID 323; R. 29-1, PAGEID 609-610). Defendants MSJPD, Koo, and Koopman, were under the control and in whole or in part directed by MSJU, Elliot, Metzger, Ellerman, and Hinzman ("MSJU Defendants"). (R. 18, PAGEID 320). Two days later, on September 17, 2021, the MSJPD posted a Memorandum on the wall of the police department addressed to all MSJPD officers, and which specifically concerned Mr. Warman. The Memorandum

5

contained a picture of Mr. Warman, his class schedule, and described his motor vehicle, his license plate number, and his student permit number. It read:

> Below is the photograph of Matthew Warman. If you see him on Campus, stop him and check to see how he is doing. Politely ask why he is here. You are not to arrest him or tell him to leave Campus. Just keep an eye on him. (Keep in mind that he is a student here and has the right to be on Campus).

(R. 18, PAGEID 323). Mr. Warman had broken no laws, had not acted in a manner that was harmful to himself or to anybody else, and was a stellar student. The Memorandum is shocking in its singling him out for harassment, humiliation, and potential harm through provocation. (R. 18, PAGEID 323; R. 1-1, PAGEID 30).

On September 20, 2021, Mr. Warman was approached by Koopman just outside of one of his classes. Despite Mr. Warman having every right to be there, Koopman demanded that Mr. Warman explain what he was doing there, and then proceeded to surveil him as Mr. Warman spoke on the phone. (R. 18, PAGEID 323-24).

On September 20, 2021, Defendant Amy Metzger, an employee of MSJU, denied Mr. Warman's religious exemption. (R. 18, PAGEID 324). Metzger's declination email referred Mr. Warman to Defendant Ellerman, who created the Policy, solely or in conjunction with Metzger, and/or Elliot, and made the determination that Mr. Warman would not be granted an exemption. (R. 18, PAGEID 324). Mr. Warman's medical exemption was likewise denied, as Metzger

took the nonsensical position that he would first have to suffer an adverse reaction to the first shot in order to be eligible for a medical exemption under MSJU policy, despite his physician's warning that the shot could be potentially life-threatening to Mr. Warman in light of his conditions. (R. 18, PAGEID 324).

The next day, September 21, Mr. Warman was called to Defendant Elliott's office and met with her while Defendant Koopman stationed himself outside the door. Mr. Warman specifically advised Elliott that he had been a victim of police harassment, which Elliott completely was ignored. (R. 18, PAGEID 324-25). Instead, Elliott told Mr. Warman that he was morally obligated to follow Pope Francis and to get vaccinated, and that his religious mores had to change with the times. (R. 18, PAGEID 325).

After this meeting, on September 22, 2021, Mr. Warman appealed his religious exemption, again explaining that his sincerely held religious beliefs precluded him, in his conscience, from accepting the vaccine. (R. 18, PAGEID 325). **Around that time, he contacted the Cincinnati Children's Hospital Medical Center ("CHC"), where he had been performing clinical work and where the remainder of his schooling would take place after the fall semester**. (R. 18, PAGEID 325). He spoke with a Human Resources manager about a religious exemption for employees and was told that **CHC <u>did</u> provide such religious exemptions**. (R. 18, PAGEID 326). However, on September 30, 2021, Defendant

7

Nancy Hinzman contacted Mr. Warman and told him that he could not contact CHC in order to seek an exemption, that he could only receive an exemption through MSJU, and prohibited him from further direct contact with CHC, even though CHC would have considered and likely honored Mr. Warman's religious exemption request. (R. 18, PAGEID 326).[2]

On October 4, 2021, Metzer again denied Mr. Warman's religious exemption request. (R. 18, PAGEID 326). This, in tandem with precluding him from contacting CHC directly, rendered it impossible for Mr. Warman to complete his studies and clinical work, and deprived him of his tremendously promising future, unless he violated his conscience and risked his health by taking a COVID-19 vaccine. (R. 18, PAGEID 327).

On November 9, 2021, while he was attending class, one of Mr. Warman's professors advised the class that campus police were on the way for one of the male students in the class. (R. 18, PAGEID 327). As there were only approximately four male students in the class, and given the prior conduct of MSJU and MSJUPD, Mr. Warman reasonably feared that he was again being singled out for harassment and

---

[2] Incidentally, that same day Mr. Warman received a glowing evaluation with respect to his clinical work at CHC. The evaluation concluded that "he would offer a unique perspective and personality to pediatric psychiatric and would make a great pediatric psychiatrist nurse. (R. 18, PAGEID 326; R. 1-1, PAGEID 31-35).

asked who the police were looking for. (R. 18, PAGEID 327). He received no answer. (Id.)

Thereafter, Mr. Warman filed a complaint on the campus police website with respect to the harassment he received. He received no response. (R. 18, PAGEID 327-28; R. 1-3, PAGEID 36). Following the complaint, Mr. Warman's psychiatrist was contacted by an individual who asserted that he was with the Federal Bureau of Investigation, and who advised that he had been contacted by MSJPD to investigate Mr. Warman. (R. 18, PAGEID 328). Defendants Koopman, Koo, Elliott, Ellerman, Hinzman, and Metzger maintained contacts with the FBI, and in particular, Agent Williston. (R. 18, PAGEID 328). On or about November 12, 2021, Agent Williston called Mr. Warman's Veterans Administration psychiatrist in breach of medical secrecy requirements, including HIPAA. (R. 18, PAGEID 328). Such call by Williston was intended to be a means of intimidating and harassing Mr. Warman, retaliating against him for filing a complaint with the MSJPD, and/or attempting to cause Mr. Warman's psychiatrist to falsely believe that Mr. Warman presented a physical danger to students and staff on campus, a risk of danger to himself, and a risk for causing campus violence, all of which was completely baseless and false. (R. 18, PAGEID 328). Such acts further were, in part, an effort to cause Mr. Warman to be labelled as dangerous such that he would have his legally owned firearms seized, in violation of his Second Amendment rights, and also sought to punish him

9

for exercising he outspoken opposition to the vaccine policy, his outspoken religious views, and otherwise to deny him due process and the equal protection of the laws. (R. 18, PAGEID 328-29).[3]

Williston told Mr. Warman's psychiatrist that Mr. Warman attended MSJU and was supposed to start at CHC, both of which require COVID vaccine. (R. 18, PAGEID 329). The individual falsely told the psychiatrist that Mr. Warman was "very upset" about MSJU and CHD's vaccine requirement such that he, "get[s] up abruptly and storms out of class." (R. 18, PAGEID 329). The individual falsely told the psychiatrist that Mr. Warman "is looking at rifles online while in class," so as to portray Mr. Warman as a potentially dangerous psychopath. (R. 18, PAGEID 329). Williston falsely asserted to the psychiatrist that Mr. Warman's classmates are afraid of him. (R. 18, PAGEID 329). Williston falsely asserted to the psychiatrist about Mr. Warman's brother, who was an MSJPD police officer, that Mr. Warman's brother told Mr. Warman "that people have complained about him which angered him further and he became confrontational with the heads of the school." (R. 18, PAGEID 329). Williston falsely asserted to the psychiatrist that Mr. Warman's "friends are reporting that [Mr. Warman] has increased his alcohol consumption

---

[3] Although they sought to interfere with Mr. Warman's Second Amendment rights, Defendants were unsuccessful in doing so. Thus, Mr. Warman is not claiming that Defendants actually violated his Second Amendment rights. Regardless, their actions were demonstrative of Equal Protection violations and an overall effort to violate Mr. Warman's constitutional rights.

recently," even though Mr. Warman, in fact, does not drink alcohol. (R. 18, PAGEID 329). Williston then asserted to the psychiatrist that "[t]he deadline for the vaccine is 11/15," and that Williston "wanted this information placed in [Mr. Warman's] record." (R. 18, PAGEID 330).

**B. As a result of Defendants' actions, Mr. Warman is prevented from completing his studies and is forced to withdraw from MSJU.**

On November 15, 2021, after enduring months of hostility at the hands of Defendants, and knowing that he would be unable to complete his education since he could not get a vaccine exemption from MSJU which would permit him to finish his clinical semester at CHC, Mr. Warman withdrew from MSJU. As a consequence, he has suffered an insurmountable career setback, exacerbation of his anxiety and depression, and incurred the obligation to return stipend funds he had received from the Veterans Administration for attending graduate school. (R. 18, PAGEID 330).

In March 2022, MSJU terminated its Vaccine Policy. (R. 18, PAGEID 325).

## SUMMARY OF THE ARGUMENT

The District Court erred in dismissing Mr. Warman's federal claims and, at the very least, should have permitted Mr. Warman to replead. More specifically, it erred in determining that Defendant MSJU was not *sui juris*, despite Ohio law holding otherwise, and it exerted control over private individuals who engaged in

11

public functions by, in whole or in part, directing Koopman and Koo's activities, such that they also are liable as state actors.

Further, the District Court inappropriately weighed the facts as plead, which included Mr. Warman's specific allegation that he was not free to leave Koo and Koopman's interrogation of him (which was further bolstered by a Declaration wherein Mr. Warman specified that Koo and Koopman told him he could not leave), as they harassed him for his religious beliefs in an effort to 'break' him into getting vaccinated, all in violation of the Firs, Fourth and Fourteenth Amendments. The MSJPD then treated Mr. Warman like a criminal, posting his picture on the MSJPD bulletin board with his class schedule, vehicle make and model number, and telling officers to confront and follow Mr. Warman. Such acts were further designed to harass Mr. Warman for his religious beliefs and violated Mr. Warman's Fourteenth Amendment Equal Protection rights.

The District Court further erred in determining that Mr. Warman had not plausibly pled a violation of the Rehabilitation Act, 29 U.S.C. § 794. However, Mr. Warman specifically plead that defendants had been provided with a medical exemption letter from his physician which noted that due to Mr. Warman's significant medical history he should avoid the COVID-19 vaccine. Mr. Warman further alleged that FDA records provide that the COVID-19 vaccine was alleged to have caused thousands of deaths and health complications, which further

demonstrated that the denial of a medical exemption to Mr. Warman was plausibly discriminatory against him in light of his medical conditions.

Finally, the District Court's criticism of Mr. Warman's pleading was not warranted as the SAC comported with the *Federal Rules of Civil Procedure.* Further, the assertion that Mr. Warman's SAC was an improper "shotgun pleading" did not comport with controlling 6th Circuit law on "shotgun pleadings." Especially in light of the District Court's refusal to consider the parties' submissions from outside of the pleading, including Mr. Warman's Declaration which specified that he was specifically told by Koo and Koopman that he was not free to leave the police station during his 'interrogation,' at the very least leave to replead should have been provided to Mr. Warman.

## ARGUMENT

### Standard of Review

A motion to dismiss under *Fed. R. Civ. P.* 12(b)(6) is reviewed *de novo.* *Sistrunk v. City of Strongsville*, 99 F.3d 194, 197 (6th Cir. 1996). A court must construe the complaint in a light most favorable to the plaintiff and accept all factual allegations as true. *Id.* When an allegation is capable of more than one inference, it must be construed in favor of the plaintiff. *See, e.g., Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995). Dismissal pursuant to a *Fed.R.Civ.P.* 12(b)(6) motion is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."

13

*Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). To show grounds for relief, *Fed.R.Civ.P.* 8(a) requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Fed.R.Civ.P.* 8 "does not require 'detailed factual allegations,'" however, only that a complaint must contain sufficient factual matter which, when "accepted as true, [] 'state[s] a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)(*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). A claim is plausible, and therefore entitled to relief from a motion to dismiss under *Fed.R.Civ.P.* 12(b)(6) and 8(a), where the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Appellate review of a district court's finding of qualified immunity is reviewed *de novo*. *See O'Brien v. City of Grand Rapids*, 23 F.3d 990, 998 (6th Cir. 1994). When the defense of qualified immunity is asserted, the complaint must "include the specific, non-conclusory allegations of fact that will enable the district court to determine that those facts, if proved, will overcome the defense of qualified immunity." *Veney v. Hogan*, 70 F.3d 917, 922 (6th Cir. 1995).

**Argument**

## I. Issue One: The District Court erred dismissing Mr. Warman's Second Amended Complaint under *Rule* 12(B)(6).

In dismissing Mr. Warman's Second Amended Complaint ("SAC"), the District Court held that (1) Defendant MSJPD is not *sui juris*; (2) Defendants Elliot, Metzger, Ellerman, Hinzman, Koopman, Koo and MSJU are not state actors for 42 U.S.C. §1983 purposes; (3) Mr. Warman failed to plausibly allege a constitutional violation; (4) Mr. Warman failed to state a claim under Rehabilitation Act; and (5) the SAC was an impermissible "shotgun pleading." (R. 37, PAGEID 688-705). Each of such bases were erroneous.

### A. MSJPD is a Public Entity that is Subject to Suit, and its Police Officers Koopman and Koo are State Actors, and were Directed by Private Actors who Engaged in State Action.

The District Court erroneously determined that MSJPD cannot be sued since it is not *sui juris*. (R. 37, PAGEID 693-94). The District Court further inconsistently held, on one hand, that Koopman and Koo were not state actors for (R. 37, PAGEID 698), before then determining on the perceived merits that Koopman and Koo did not unlawfully arrest Mr. Warman and were entitled to qualified immunity. (R. 37, PAGEID 702). Both rulings were erroneous and must be reversed.

MSJPD is a commissioned law enforcement agency of Ohio. *ORC* §1713.50 explicitly provides that private universities may establish campus police departments which have police powers on campus which are concurrent with municipal police

15

and county sheriffs. *ORC* 1713.50(C); (R. 18, PAGEID 313). Individuals are eligible to be campus police officers only if they "have successfully completed a training program approved by the Ohio peace officer training commission and have been certified as having done so or who have previously successfully completed a police officer basic training program certified by the commission and have been awarded a certificate to that effect by the commission." *ORC* 1713.50(B).

In concluding that MSJPD was not *sui juris*, the District Court relied on *Hale v. Vance*, 267 F.Supp.2d 725 (S.D. Ohio 2003), and *Lawson v. City of Youngstown*, 912 F. Supp.2d 527 (N.D. Ohio 2012). However, *Hale* concerned municipal police departments, and *Lawson* concerned municipal courts, both of which are under the dominion and control of municipalities and, thus, are not *sui generis.*

Unlike *Hale* and *Lawson*, campus police departments possess state police powers while operating under the putative control of private entities. Their duties include "the enforcement of the regulations of the college or university" and necessarily exist to "preserve the peace, protect persons and property, enforce the laws of this state, and enforce the ordinances and regulations of the political subdivisions in which the private college or university is located, but only on the property of the private college or university that employs them." *ORC* 1713.50(B-C).

In *State ex rel. Schiffbauer v. Banaszak*, 142 Ohio St. 3d 535, 537 (2015), the Ohio Supreme Court held that the wide ranging powers available to campus police officers include "the power to search and confiscate property, to detain, search, and arrest persons, and to carry deadly weapons," per their statutory authority. As such, because a private institution's campus police department is "performing a function that is historically a government function," it is acting as a "public office" and could be compelled to answer to process. *Id.* at 538. Consequently, the public office of the MSJPD is *sui juris*.

A "public office" is "any state agency, *public institution,* political subdivision, or any other organized body, office, agency, institution, or entity established by the laws of this state for the exercise of any function of government." *State ex rel. Fox*, 39 Ohio St. 3d 108, 110 (1988); *ORC* 149.011(A). "[T]he government's undertaking of a function through an entity established by law necessarily makes that function a function of government, even if the function is not historically governmental." *State ex rel. Fair Hous. Opportunities of Nw. Ohio v. Ohio Fair Plan*, 172 Ohio St. 3d 149, 153 (2023). Consequently, MSJPD is a "public office" as a matter of law, and its officers, Koo and Koopman "public officers" in carrying out their duties.

The District Court examined the tests of *Lindke v. Freed*, 37 F.4th 1199, 1202 (6th Cir. 2022), to determine "whether a private party's action is attributable to the state... ." (R. 37, PAGEID 696). Such tests include the "public function" test, the

"state-compulsion" test, and the "symbiotic or nexus" test. (R. 37, PAGEID 696-97). However, application of such tests is irrelevant here given that MSJPD is a public office and Koopman and Koo are public officers. As the Ohio Supreme Court noted in one case, "[w]hen an entity is a 'public office' under *ORC* 149.011(A), the functional-equivalency test is inapplicable." *State ex rel. Fair Hous. Opportunities of Nw. Ohio,* 172 Ohio St. 3d at 153. Nor do the other tests of *Lindke* apply since there is no need to determine whether a private entity, which may not be a traditional state actor, is engaged in action attributable to the state in such circumstances. Instead, such determination is already made as a matter of law.

Moreover, Mr. Warman alleges that the MSJU Defendants became state actors by virtue of having their private mandate enforced through state actors Koopman and Koo of MSJPD. In so doing, the MSJU Defendants, although a private entity, and its employees were exercising powers that were "fairly attributable to the state" because in controlling and directing state actors, they exercised "powers which are traditionally exclusively reserved to the state." *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992). Thus, the MSJU Defendants are plausibly alleged in the SAC to be liable as state actors.

For such reasons, MSJPD is subject to being sued, and Koopman and Koo are state actors. Moreover, the MSJU Defendants also were state actors with respect to

their direction of MSJPD, Koopman and Koo to violate Mr. Warman's constitutional rights. Thus, the dismissal must be vacated as to all such issues.

**B. The SAC Plausibly Alleges that Koopman and Koo Violated Mr. Warman's Fourth and Fourteenth Amendment Rights.**

The District Court failed to examine the allegations when asserting that "given the circumstances alleged in the SAC, a reasonable person would believe he was free to leave." (R. 37, PAGEID 702). In making such determination, the District Court weighed the facts that were alleged and examined them in a light least favorable to Mr. Warman, contrary to the standard of care. Thus, such determination should be reversed.

In the seminal Fourth Amendment seizure case, *Terry v. Ohio*, the Supreme Court noted, "when the officer, by … **show of authority**, **has in some way restrained the liberty of a citizen** may we conclude that a 'seizure' has occurred." 392 U.S. 1, 19 n.16 (1968). In *United States* v. *Martinez-Fuerte*, the Supreme Court noted that in situations as described in *Terry*, an individual's "freedom of movement is restrained." 428 U.S. 543, 554 (1976). Further, the Fourth Amendment's purpose is "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." Thus, "as long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." *Id.*

19

As noted above, Koopman and Koo are state actors as a matter of law and were allegedly directed by the MSJU Defendants, in whole or in part. As detailed in the SAC and below, in keeping with their statutory authority to carry out campus policy, Koopman and Koo called Mr. Warman to MSJPD where, it is specifically alleged, that they took him "into a back room of the campus police station **and would not allow him to leave**, thus arresting him in fact." (R. 37, PAGEID 321; R. 29-1, PAGEID 608-09) (emphasis added).

The entire purpose of the one hour and ten minutes of abusive interrogation, was to intrude upon Mr. Warman's liberty and privacy, including to berate him for his particular Catholic religious beliefs which were out of step with defendant Elliott's. As noted above, although calling someone into a police station to discuss whether a person received a vaccine may not be typical municipal police behavior, in light of their being statutory public officers, Koo and Koopman's conduct took on the authority of the state and constituted police actions, contrary to the District Court's analysis. In refusing to let Mr. Warman leave, he was arrested in violation of his Fourth and Fourteenth Amendment rights.[4]

---

[4] Mr. Warman also submitted a supplemental Declaration responding to extraneous evidence relied on by Defendants in their motion. In such Declaration, Mr. Warman asserted that he was unequivocally told by Koo and Koopman that he could not leave. The District Court refused to consider such information and did not provide Mr. Warman with an opportunity to re-plead to clarify, but rather, dismissed on grounds that Mr. Warman did not plausibly allege that he could not leave. (R. 29-1, PAGEID 609; R. 37, PAGEID 689).

**C. Mr. Warman has Stated a Plausible Claim under the Rehabilitation Act.**

Mr. Warman suffers from disabilities which he alleges precluded him from taking the COVID-19 vaccine, per a medical exemption from his doctor. The MSJU Defendants denied his medical exemption which would have compelled Mr. Warman to become vaccinated in order to finish his last semester, a clinical at CCH. Such denial was discriminatory against Mr. Warman based on his medical condition.

The Rehabilitation Act of 1973 provides, in pertinent part

> No otherwise qualified individual with a disability in the United States, as defined in section 7(20) [29 *U.S.C.* § 705(20)], shall, solely by reason of her or his disability, **be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance**... (emphasis added):

29 *U.S.C* § 794 ("Section 504"). Actionable claims under Section 504 consist of four elements: (1) the plaintiff is a "[disabled] person" under the Act; (2) the plaintiff is "otherwise qualified" for participation in the program; (3) the plaintiff is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely by reason of his disability; and (4) the relevant program or activity is receiving federal financial assistance. *Sandison v. Mich. High Sch. Athletic Ass'n*, 64 F.3d 1026, 1030-31 (6th Cir. 1995).

Section 504 utilizes the same definition of "disability" as the *Americans with Disabilities Act*, 29 *U.S.C.* § 705, and as such, a person can be "disabled under Section 504 if he has: (1) a physical or mental impairment that substantially limits

one or more major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment. *See, e.g., Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002).

Here, Mr. Warman alleges that he was discharged from the Marines because of his recognized physical disabilities which, together with his psychological injuries, were known to defendants even before his Medical Doctor asserted that Mr. Warman had to avoid the COVID vaccines due to such conditions. Further, Mr. Warman was "otherwise qualified" to continue receiving his Veteran's Administration ("VA") benefits to attend MSJU. Mr. Warman was unable to be vaccinated due to his medical condition, such that he was deprived of continuing at MSJU. Since MSJU was receiving VA benefits for Mr. Warman's attendance, it was receiving federal assistance. Thus, Mr. Warman has pled all criteria necessary for a claim under Section 504.

Moreover, Mr. Warman would have likely been able to receive an exemption from CCH, the hospital where he was to perform the clinical which was all he needed to graduate. However, Mr. Warman was admonished for speaking with CCH personnel about an exemption and was told that he must get any exemption from MSJU, even though his last semester was only going to be spent at CCH. Thus, the MSJU Defendants actively intervened to prevent Mr. Warman from obtaining his medical exemption so that he would be unable to finish his MSJU education.

Mr. Warman's Medical Doctor is alleged to have provided MSJU with the opinion that Mr. Warman was not a good candidate for the vaccines and had to avoid them. Mr. Warman also alleged that as of the date that MSJU terminated its vaccine policy, there were 13,273 deaths reportedly caused by COVID vaccines under the FDA'a VAERS reporting system, and numerous major life-threatening physical conditions were reported as well.[5] Mr. Warman specifically plead that the "MSJU medical exemption policy exposed Mr. Warman to potential death or debilitating injury." (R. 37, PAGEID 324).

Despite these well-pleaded allegations, the District Court determined that Mr. Warman did not allege that his disability, including brain tumors and digestive system destruction, were not contraindicated by the COVID vaccines. (R. 37, PAGEID 704-05). This was factually ludicrous, as Mr. Warman's physician is alleged to have stated as much. (R. 18, PAGEID 320). It is axiomatic that whether District Court *believed* Mr. Warman's doctor is an improper consideration at the pleading stage. A sister circuit recently held that when supporting facts are alleged, including allegations as to vaccine-effectiveness, they must be taken as true even if they go against what may be conventional wisdom, rendering dismissal improper.

---

[5] Judicial notice can be taken of this fact since it arises from an official government record. *United States v. O'Dell*, 805 F.2d 637, 643-644 (6th Cir. 1986) (although not required, this Court may take judicial notice of public record facts).

*Health Freedom Def. Fund, Inc. v. Carvalho*, __ F.4th __, 2024 U.S. App. LEXIS 13910, *22 (9th Cir. 2024).

Additionally, the notion that there is an exclusive list which may be the only bases for medical exemption as a matter of law is not supported by any cases cited by the District Court. In the meantime, the SAC plausibly alleges that Mr. Warman's Medical Doctor determined that the risks of COVID vaccination to a man like Warman, who has had such significant medical conditions, were much too great particularly when compared to the minimal risk that COVID-19 presented to him.

In light of Mr. Warman's alleged medical conditions, the medical exemption, and the publicly available facts about some of the potential health risks associated with the COVID-19 vaccines, Mr. Warman has plausibly pled that he had a medical need to avoid the vaccines, which is sufficient to state a claim under Section 504.

### D. Mr. Warman Stated a Plausible Fourteenth Amendment Equal Protection Claim.

Mr. Warman alleges that he was treated differently than everybody else who sought exemptions from the MSJU vaccine policy because, rather than simply denying the exemption, MSJU had its police force intervene and treat Mr. Warman as if he was a danger, going so far as to arrest him in fact without a warrant, posting his photo, vehicle information, and class schedule on the police bulletin board with a directive to approach him on campus, and then following him on campus. Thus, a facially neutral COVID-19 campus vaccine policy became the subject of state action

24

which specifically discriminated against Mr. Warman. Under the circumstances, Mr. Warman has plausibly alleged a violation of his Fourteenth Amendment Equal Protection rights.

"A plaintiff alleging an equal protection claim under a theory of discriminatory application of the law, or under a theory of discriminatory motivation underlying a facially neutral policy or statute, generally need not plead or show the disparate treatment of other similarly situated individuals." *See e.g., Pyke v. Cuomo*, 258 F.3d 107, 108-109 (2d Cir. 2001). The *Pyke* court further held that "a plaintiff alleging a claim of selective prosecution in violation of the Equal Protection Clause must plead and establish the existence of similarly situated individuals who were not prosecuted..." *Pyke,* 258 F.3d at 109. The Court then explained that such rule exists "because courts grant special deference to the executive branch in the performance of the 'core' executive function of deciding whether to prosecute." *Ibid.* However, when **not** making a selective prosecution claim, "[t]he *Armstrong* rule has no application to their claim." *Ibid.* Thus, in *Pyke*, which alleged that police failed to protect the plaintiffs because they were Native Americans, the Court held that "[s]o long as they allege and establish that the defendants discriminatorily refused to provide police protection because the plaintiffs are Native American, plaintiffs need not allege or establish the disparate treatment of otherwise similarly situated non-Native American individuals." *Ibid.*

In the present case, Mr. Warman does not make a claim of selective prosecution. Rather, he claims that he was treated disparately because of his beliefs. In *United States v. Ave*ry, 137 F.3d 343, 353 (6th Cir. 1997), this Court found that "the Fourteenth Amendment protects citizens from police action, including the decision to interview an airport patron, based solely on impermissible racial considerations." This Court continued that "a citizen's right to equal application of the laws [begins] at the point when an officer engages in conversation with that citizen." *Ibid.* While *Avery* particularly related to race discrimination in an airport, this Court noted that "[s]imilarly, we find that all individuals possess the constitutional right to equal protection as they walk through America's airports." *Ibid.* Thus, this Court held that "citizens are entitled to equal protection of the laws at all times. If law enforcement adopts a policy, employs a practice, or in a given situation takes steps to initiate an investigation of a citizen based solely upon that citizen's race, without more, then a violation of the Equal Protection Clause has occurred." *Id.* at 355. Thus, "in order 'to prevail under the Equal Protection Clause, [a defendant] must prove the decision makers in *his* case acted with discriminatory purpose.'" *Ibid.* (*quoting McCleskey v. Kemp,* 481 U.S. 279, 292 (1987)). "In the airport-stop context, a defendant would have to demonstrate by a preponderance of the evidence that a police officer decided to approach or pursue him or her solely because of his or her race." *Ibid.* (cleaned up, quotation omitted).

Here, Mr. Warman was treated in a manner whereby the law was unequally applied to him versus others. He was treated as a criminal. Circumstantial evidence points to the reason being that Mr. Warman was a conservative Catholic who did not view Catholicism in the manner of Defendants. More specifically, Mr. Warman alleged that Elliott told Mr. Warman that he was morally obligated to get vaccinated, to follow Pope Francis, and that his religious mores had to change with the times, (R. 18, PAGEID 325). Mr. Warman further alleged that Defendants Koo and Koopman belittled his religious practices, told him to get a new religion, and that his beliefs were wrong, among other things. (R. 18, PAGEID 321-22). Then, when Mr. Warman complained to Elliot that he had been the victim of police harassment (including having his picture posted on the police bulletin board as if he was "Wanted," and following him around campus), Elliot simply ignored him. Similarly, his official complaint to the police was ignored. (R. 18, PAGEID 325). Defendants then engaged an FBI agent to plant false stories about Mr. Warman with his psychiatrist, thus involving additional police action. (R. 18, PAGEID 328-29).

The above allegations demonstrate circumstantially that Mr. Warman was specifically targeted because of his personal religious beliefs and was treated differently than everybody else. While discovery likely will reveal numerous other individuals who applied for exemptions and were not treated in such a manner, such proofs would be impossible to obtain at the pleading stage. *See Pyke*, *supra,* 258

F.3d at 109 ("[i]t would be difficult, if not impossible, to find other individuals whose situation is similar..."). Regardless, given the nature of the alleged discrimination, it is unnecessary for Mr. Warman to allege comparators at this time.

## II. <u>Issue Two: The District Court erred in determining that Defendants were entitled to qualified immunity.</u>

"The doctrine of qualified immunity shields officers from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (*quoting Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (*quoting District of Columbia v. Wesby*, 583 U. S. 48, 62 (2018); *Malley* v. *Briggs*, 475 U. S. 335, 341 (1986)). The determination of whether qualified immunity exists requires a two-part examination: (1) "whether the plaintiff suffered a violation of his constitutional rights;" and (2) whether the constitutional right in question was a clearly established constitutional right of which a reasonable person would know." *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 263 (6th Cir. 2006). "[I]t is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015).

The Fourth Amendment is "made applicable to the States by the Fourteenth" Amendment. *Soldal v. Cook County*, 506 U.S. 56, 61 (1992). Fourth Amendment

violations give rise to claims under 42 *U.S.C.* § 1983. *See, generally, Manuel v. City of Joliet*, 580 U.S. 357, 368 (2017)(holding that illegal arrest at any time gives rise to a claim under § 1983). The Court in *Manuel* held that the plaintiff stated a Fourth Amendment claim when he sought relief not merely for his (pre-legal-process) arrest, but also for his (post-legal-process) pretrial detention. *Id.*

"A section 1983 wrongful arrest claimant must prove that the arresting officers lacked probable cause to believe that the suspect had committed the charged crime." *Painter v. Robertson*, 185 F.3d 557, 569 (6th Cir. 1999). "'Probable cause' denotes 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Ibid.* (*quoting Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988), *quoting in turn Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). Put another way, "[a] police officer has probable cause if there is a 'fair probability' that the individual to be arrested has either committed or intends to commit a crime. *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002). Further, "[a] right is clearly established when the 'contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020) (*quoting Morrison v. Bd. of Trs.,* 583 F.3d 394, 400 (6th Cir. 2009)).

Taken in a light most favorable to Mr. Warman, the facts as pled demonstrate that he was not free to leave the 'interrogation' by Koo and Koopman such that he was arrested. There was no probable cause to believe that there existed a fair probability that Mr. Warman had committed or intended to commit a crime. Police Chief Koo and Captain Koopman certainly understood that they had no right to so detain Mr. Warman given the clearly defined contours of Fourth Amendment probable cause requirements for an arrest. Consequently, they are not entitled to qualified immunity such that the District Court's decision in such regard must be reversed.

Additionally, doubt has been raised as to the propriety of university officials availing themselves of qualified immunity at all. *See, e.g., Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422 (2021) (Thomas, J., concurring) ("why should university officers, who have time to make calculated choices about enacting or enforcing unconstitutional policies, receive the same protection as a police officer who makes a split-second decision to use force in a dangerous setting? We have never offered a satisfactory explanation to this question.") Should this Court determine that qualified immunity does exist, Mr. Warman hereby raises Justice Thomas's concurrence in *Hoggard* to preserve the right to seek Supreme Court reconsideration of the qualified immunity doctrine as applied to campus police officers in a context such as that herein.

**III. Issue Three: The District Court erred in refusing to grant leave to Mr. Warman to Amend his Complaint and classifying it as a "shotgun pleading."**

The District Court asserted that Mr. Warman filed an impermissible group pleading, and seems to implicitly find fault with Mr. Warman's having asserted 21 causes of action (mostly state claims), despite their validity. (R. 37, PAGEID 692,694-95). The District Court then found that "Plaintiff engages in impermissible group pleading by collectively and without specificity alleging these [federal] claims against all the MSJU Defendants." (R. 37, PAGEID 694).

Rather than focus on the 118 paragraphs of detailed fact allegations in the **Verified** SAC, which included allegations theorizing how individual defendants became state actors by employing a police force to violate Mr. Warman's rights in enforcing the vaccine policy, and which even openly involved at least one of the administrators, Elliott, who was not a law enforcement officer (*see, e.g.,* R. 18, PAGEID 320-21,322,324-5,326,327-28), the District Court focused on the specific causes of action which incorporated such allegations by reference. (R. 37, PAGEID 695-96). Yet the preceding allegations very obviously alleged in various parts that Defendants' actions implicated Mr. Warman's First Amendment right to worship (*see, e.g.,* R. 18, PAGEID 320,321,324,325), Second Amendment (*see, e.g.,* R. 18, PAGEID 328,330), and Fourth Amendment (*see, e.g.,* R. 18, PAGEID 321-23). All such Amendments apply to the states through the Fourteenth Amendment. Regardless of such specificity, the District Court asserted that the pleading made "it

virtually impossible for a defendant to know which allegations of fact are intended to support which claims for relief." (R. 37, PAGEID 696).

Further, the District Court lengthily footnoted its belief that the SAC constituted "an impermissible 'shotgun pleading.'" In doing so it quoted *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321 (11th Cir. 2015), at length to demonstrate examples of "shotgun pleadings." In that same footnote the District Court cited *Arnold v. CooperSurgical, Inc.*, 681 F.Supp.3d 803, 823-24 (S.D. Ohio 2023), which also cited *Weiland*. However, the District Court failed to note that in *Arnold*, the Court distinguished *Weiland* by noting that the 6th Circuit does not use the term "shotgun pleading" in the way it is used in *Weiland,* but rather, does "so in the context of a plaintiff's failure to separate his causes of action or claims for relief into separate counts." *Id.* at 824 (*citing Lee v. Ohio Educ. Ass'n*, 951 F.3d 386, 393 (6th Cir. 2020)). In *Lee*, this Court found fault with the pleading because the plaintiff therein included seven counts within a single sentence of the Complaint, which "violated Rule 8(a)(2)'s requirement that [the plaintiff] provide the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Lee,* 951 F.3d at 392-393 (quotation omitted).

Mr. Warman made numerous and specific allegations and asserted valid causes of action. There is no similarity between Mr. Warman's SAC and the pleading in *Lee*. Indeed, Mr. Warman's pleading simply repeated and realleged the specific

32

allegations within each Count. With respect to the federal claims, the specific allegations demonstrated why "all Defendants other than FBI and Williston" were alleged to have violated Mr. Warman's constitutional rights. Such incorporation of the prior specific allegations in the Complaint within each individual Count, which explains the alleged violations by all other defendants, is specifically permitted by *Fed. R. Civ. P.* 10(c).

Finally, attached to their motion to dismiss, Defendants appended various extraneous documents which, in opposition, Mr. Warman rebutted with a Declaration. (R. 29-1, PAGEID 608-10). In that Declaration, Mr. Warman recounted that Koo and Koopman specifically told him that he was not free to leave while being berated, humiliated, and interrogated by them. The District Court ultimately, determined that it would not consider any of the extraneous evidence, but found that based on Mr. Warman's pleading, "a reasonable person would believe that [Mr. Warman] **was** free to leave." (emphasis added) (R. 37, PAGEID 689). Given Mr. Warman's very specific Declaration before the District Court that he was told that he was **not** free to leave, at the very least, in the interest of justice, Mr. Warman should have been granted leave to replead. *See Keweenaw Bay Indian Community v. Michigan*, 11 F.3d 1341, 1348 (6th Cir. 1993) ("Pursuant to Rule 15(a), 'leave shall be freely given when justice so requires.'").

## CONCLUSION

Based on the foregoing, the Decision of the District Court should be reversed, with all claims being reinstated, including state claims which were dismissed without prejudice due to the District Court declining to continue the exercise of supplemental jurisdiction. To the extent appropriate to clarify any points, Mr. Warman should be granted leave to replead in the interests of justice.

Respectfully submitted,

/s/ Ronald A. Berutti

Ronald A. Berutti (NJ 023361992/*Pro Hac Vice)*
MURRAY-NOLAN BERUTTI LLP
100 E. Hanover Avenue, St. 401
Cedar Knolls, New Jersey 07927
ron@murray-nolanberutti.com
*Attorney for the Plaintiff-Appellant*

/s/ Matthew S. Okiishi

Matthew S. Okiishi (00096706)
FINNEY LAW FIRM, LLC
4270 Ivy Pointe Blvd., Ste 225
Cincinnati, Ohio 45245
(513) 943-6659
(513) 943-6669 – fax
matt@finneylawfirm.com
*Local Counsel for the Plaintiff-Appellant*

<u>**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**</u>

**Certificate of Compliance with Type-Volume Limit, Typeface Requirements, and Type-Style Requirements**

1. This document complies with the word limit of *Fed. R. App. P.* 32(a)(7)(B) because, excluding the parts of the document exempted by *Fed. R. App. P.* 32(f) and *Fed. R. App. P.* 32(a)(7)(A). This document contains 8,137 words.

2. This document complies with the typeface requirements of *Fed. R. App. P.* 32(a)(5) and the type-style requirements of *Fed R. App. P.* 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word Business 365 in 14-point font and Times New Roman.

*/s/ Matthew S. Okiishi*
Local Counsel for <u>Plaintiff-Appellant</u>           Dated:   <u>June 14, 2024</u>

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing was electronically filed. Notice of this filing will be sent to all parties through the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Ronald A. Berutti_____
Ronald A. Berutti (NJ 023361992/*Pro Hac Vice*)

# **<u>APPENDIX</u>**

1. Order issued by the United States District Court, Southern District of Ohio on

   January 3, 2024, R. No. 37.

All of the materials required by Cir. R. 30(a-b) are included in the foregoing
Appendix.

*/s/ Matthew S. Okiishi*
Matthew S. Okiishi (0096706)

# ADDENDUM
## (Designation of Relevant Documents Rule 30(g))

| | Record Entry | Page ID# |
|---|---|---|
| Plaintiff's Second Amended Verified Complaint And Jury Demand | 18 | 309-345 |
| Defendants' Joint Motion to Dismiss Plaintiff's Second Amended Complaint | 23 | 412-469 |
| Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss Second Amended Complaint | 26 | 477-532 |
| Declaration of Matthew Warman | 29-1; 29-2; 29-3 | 608-618 |
| Defendants' Reply In Further Support of Defendants' Motion to Dismiss | 30 | 619-640 |
| Order | 37 | 688-706 |